Name        David Samuel

Name        Sydney Roberts

Street Address    1100 Howe Ave, Apt 126

City and County    Sacramento, Sacramento

State and Zip Code    California, 95825

Telephone Number    512-917-8112



**[ FILED ]**

APR 2 5 2023

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
          DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

Sydney Brooke Roberts

David Tyrone Samuel

AIMS, a minor

DAYS, a minor

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

   **-against-**

Sacramento Housing and Redevelopment Authority,

City of Sacramento Housing Authority,

County of Sacramento Housing Authority,
 see attached,

*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

**Amended Complaint for a Civil Case**

Case No. 2:22-CV-01699-DJC AC

*(to be filled in by the Clerk's Office)*

Jury Trial:    ☒ Yes    ☐ No
              *(check one)*

**I.    The Parties to This Complaint**

    **A.    The Plaintiff(s)**

    Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | See attached |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

    **B.    The Defendant(s)**

    Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known).  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | See Attached |
| Job or Title (if known) | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title (if known) | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

2

Defendant No. 3

|                       |   |
|-----------------------|---|
| Name                  |   |
| Job or Title (if known) |   |
| Street Address        |   |
| City and County       |   |
| State and Zip Code    |   |
| Telephone Number      |   |

Defendant No. 4

|                       |   |
|-----------------------|---|
| Name                  |   |
| Job or Title (if known) |   |
| Street Address        |   |
| City and County       |   |
| State and Zip Code    |   |
| Telephone Number      |   |

## II.    Basis for Jurisdiction

Federal Courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in Federal Court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same state as any plaintiff.

What is the basis for Federal Court jurisdiction? *(check all that apply)*

☒  Federal question                ☐  Diversity of citizenship

3

Fill out the paragraphs in this section that apply to this case.

**A.    If the Basis for Jurisdiction Is a Federal Question**

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

Americans with Disabilities Act and Amendments (ADA), Fair Housing Act and Amendments (FHA), Rehabilitation Act and Amendments (REHAB), Equal Protection and Due Process clauses of the 14th Amendment (14TH).

**B.    If the Basis for Jurisdiction Is Diversity of Citizenship**

1.    The Plaintiff(s)

    a.    If the plaintiff is an individual

The plaintiff, *(name)* _____, is a citizen of the State of *(name)* _____.

    b.    If the plaintiff is a corporation

The plaintiff, *(name)* _____, is incorporated under the laws of the State of *(name)* _____, and has its principal place of business in the State of *(name)* _____.

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

    a.    If the defendant is an individual

The defendant, *(name)* _____, is a citizen of the State of *(name)* _____. *Or* is a citizen of *(foreign nation)* _____.

4

b.    If the defendant is a corporation

The defendant, *(name)* _____, is incorporated under the laws of the State of *(name)* _____, and has its principal place of business in the State of *(name)* _____.  *Or* is incorporated under the laws of *(foreign nation)* _____, and has its principal place of business in *(name)* _____.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy—the amount the plaintiff claims the defendant owes or the amount at stake—is more than $75,000, not counting interest and costs of court, because *(explain)*:

Due to Defendants acts, Plaintiffs have experienced emotional distress, humiliation, loss of rights and priveleges, denial or harm to medical treatment, educational opportunities, employment opportunities.  Statute defines penalties for these acts in excess of $75,000.

## III.    Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

See attached

_____

_____

_____

_____

5

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

See attached

_____

_____

_____

_____

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: April 25, 2023.

Signature of Plaintiff _____

Printed Name of Plaintiff    Sydney Brooke Roberts

Signature of Plaintiff _____

Printed Name of Plaintff    David Tyrone Samuel

6

# I. INTRODUCTION

1) This complaint arises from discriminatory policies and practices by the Defendants, who administer the Department of Housing and Urban Development ("HUD") Housing Choice Voucher ("HCV") program.

2) The HCV program, widely known as "Section 8", provides a rental subsidy called a Housing Assistance Payment ("HAP") to extremely low income households who meet certain qualifications. Households are required to contribute a portion of their income to the rent payment, with the rest covered by the HAP.

3) HAP are administered by Public Housing Agencies ("PHA"), which cover a geographic area usually coinciding with a city or county jurisdiction. For PHAs to receive funding for these payments, they agree to comply with all federal laws, regulations, HUD guidance, and waive sovereign immunity for violations.

4) PHAs benefit from the HCV program as it assists in meeting several civic goals, including de-concentration of poverty and reduction of homelessness.

5) PHAs are required to contribute a portion of the funds necessary to support the HCV program, with those funds coming from the City and County.

6) In an attempt to control the necessary contribution to the program, PHAs will often enact discriminatory policies or engage in discriminatory practices to limit the scope of participation for HCV recipients.

7) This complaint arises from those discriminatory policies and practices by the Defendants, in which Plaintiffs experienced extensive discrimination and denial of rights and privileges due to Defendants stated policy and continuing practice of denying access for reasons outside of those proscribed by statute and regulation.

8) The Defendants over the past three years have repeatedly entered into compliance agreements where they agree to not engage in the acts alleged in this complaint, and agree to invest tens of thousands of dollars to train employees to

1

avoid discriminatory behavior, all the while continuing to engage in the same behavior.

9)    There are seven items in this complaint; 1) disability and housing discrimination by denial of reasonable accommodation, 2) denial of fourteenth amendment due process and equal protection, 3) disability and housing discrimination, denial of equal protection due to disability type, 4) disability and housing discrimination, civil rights violations from denial of access to services, 5) housing discrimination and civil rights violations from discrimination based on family composition, 6) retaliation, and 7) failure to correct discriminatory policies.

10)    This Complaint alleges that the Defendants were properly trained and notified that these acts were discriminatory, that they were aware that Plaintiffs were being harmed by the acts, and that they exhibited indifference to both the discrimination and harm caused by it.

## II. PARTIES

### A.    Plaintiffs

#### 1.    Sydney Brooke Roberts

11)    Sydney Brooke Roberts ("MADDY") is a resident of the city and county of Sacramento, with a current mailing address of 1100 Howe Ave, Apt 126, Sacramento, CA 95825 and phone number of 512-917-8112. Co-Plaintiffs David Tyrone Samuel ("DAVID"), AIMS (a minor), and DAYS (a minor) also use the same address and telephone number. Sydney uses the name "Maddy" or "Madelena" in all personal interactions.

12)    MADDY, DAVID, AIMS, and DAYS are part of a household in the housing choice voucher ("HCV") program from the Department of Housing and Urban Development ("HUD") and administered by Sacramento Housing and Redevelopment Agency ("SHRA"). This household has been enrolled in the program since September 2018, and as of the time of this filing are in good standing with the program. Collectively, MADDY, DAVID, AIMS, and DAYS

2

are referred to as "FAMILY".

13)   MADDY is the partner of co-Plaintiff DAVID and parent of co-Plaintffs AIMS, and DAYS.

14)   MADDY currently experiences a severe restriction on life activities and is being treated for Major Depressive Disorder, Recurrent ("MDD"), Post-Traumatic Stress Disorder ("PTSD"), and General Anxiety Disorder ("GAD") through her medical provider.

**2.    David Tyrone Samuel**

15)   DAVID is the partner of MADDY and parent of AIMS and DAYS.

16)   DAVID is a qualified handicapped/disabled individual, currently receiving Social Security Disability Insurance benefits ("SSDI"), and experiences a severe restriction on life activities because of his disabilities.  DAVID currently receives treatment for Autism Spectrum Disorder ("ASD"), chronic Post-Traumatic Stress Disorder ("cPTSD"), Attention Deficit Hyperactivity Disorder ("ADHD"), and Mood Disorder ("MOOD").

17)   Defendants SHRA and it's employees have been aware of DAVID's qualified disability status the entire time the family has been in the HCV program, having received confirmation through a benefit award letter from the Social Security Administration (SSA) regarding DAVID's SSDI income, DAVID's personal assertion, and medical records provided to SHRA from DAVID's health care provider.

18)   Defendant SHRA currently notes DAVID's qualified status in the FAMILY case file and has acknowledged in writing that DAVID requires reasonable accommodation.

**3.    AIMS**

19)   AIMS is a minor, the child of MADDY and DAVID.

20)   AIMS is a qualified handicapped/disabled individual, experiencing severe restrictions on life activities due to Autism Spectrum Disorder ("ASD"), and

3

Roberts v. Sacramento Housing and Redevelopment Agency, 4th Amended Complaint - 2:22-CV-01699-DJC AC

Developmental/Milestone Delays ("DELAY"). AIMS requires intensive speech and language therapy, occupational therapy, and behavioral therapy due to these conditions.

21) Defendant SHRA is aware of AIMS qualified status having received her medical records, and has acknowledged AIMS requires reasonable accommodation as noted in the accommodation denial letters transmitted to the family by SHRA.

**4.    DAYS**

22) DAYS is an infant minor, the child of MADDY and DAVID.

23) DAYS requires reasonable accommodation as she cannot share a room unsupervised with AIMS due to ongoing behavioral issues. SHRA is aware of the need for reasonable accommodation through the receipt of AIMS medical records and the testimony of her parents.

**B.    Defendants**

**1.    SHRA and employees**

24) SHRA operates the HCV program on behalf of the Housing Authority of the City of Sacramento ("CITY") and Housing Authority of the County of Sacramento ("COUNTY") Public Housing Authority ("PHA"). SHRA operates in the city and county of Sacramento, with a listed address of 801 12th Street, Sacramento, CA 95814 for it's Public Housing Administration office. SHRA has listed telephone number of 916-440-1314 for it's Public Housing Administration office, 916-440-1330 for it's Legal office.

25) SHRA is being named in this complaint in it's official capacity as administrator of the HCV program for the City and County of Sacramento.

26) LaShelle Dozier ("DOZIER"), executive director of SHRA, with address and telephone number the same as SHRA. LaShelle Dozier is being named in her individual capacity for the acts in this complaint.

27) MaryLiz Paulson ("PAULSON"), Director Housing Choice Voucher program for SHRA, 504 compliance officer, with address and telephone number

4

Roberts v. Sacramento Housing and Redevelopment Agency, 4th Amended Complaint - 2:22-CV-01699-DJC AC

the same as SHRA. MaryLiz Paulson is being named in their individual capacity for the acts in this complaint.

28)    Troy Lynch ("LYNCH"), Program Manager for SHRA, with address and telephone number the same as SHRA.  Troy Lynch is being named in his individual capacity for the acts in this complaint.

29)    Tanya Cruz ("CRUZ"), Program Manager for SHRA, with address and telephone number the same as SHRA.  Tanya Cruz is being named in her individual capacity for the acts in this complaint.

30)    Lisa Macias ("MACIAS"), Case Worker for SHRA, with address and telephone number the same as SHRA.  Lisa Macias is being named in her individual capacity for the acts in this complaint.

31)    Ibra Henley ("HENLEY"), Unknown Position for SHRA, with address and telephone number the same as SHRA.  Ibra Henley is being named in her individual capacity for the acts in this complaint.

**2.**    Housing Authority of the City of Sacramento ("CITY") and it's executives

32)    CITY has no listed address or phone number other than 801 12th Street, Sacramento CA, 95814, the same as SHRA.  CITY is being named in it's official capacity, as the organization responsible for the CITY PHA plan.  CITY members are listed on SHRA website (https://www.shra.org/transparency/board-agenda/) and are ultimately responsible for policy and practice documents in use by SHRA.

33)    Darrell Steinberg, Mayor, named in his individual capacity, with a listed address of 915 I Street, 5th Floor Sacramento, CA 95814, and phone number of 916-808-5300.

34)    Lisa Kaplan, District 1, named in her individual capacity, with an address of 915 I Street, 5th Floor, Sacramento, CA 95814, and a phone number of 916-808-7001.

35)    Sean Loloee, District 2, named in his individual capacity, with an address of

5

915 I Street, 5th Floor, Sacramento, CA 95814, and a phone number of 916-808-7002.

36)    Karina Talamantes, District 3, named in her individual capacity, with an address of 915 I Street, 5th Floor, Sacramento, CA 95814, and a phone number of 916-808-7003.

37)    Katie Valenzuela, District 4, named in her individual capacity, with an address of 915 I Street, 5th Floor, Sacramento, CA 95814, and a phone number of 916-808-7004.

38)    Caity Maple, District 5, named in her individual capacity, with an address of 915 I Street, 5th Floor, Sacramento, CA 95814, and a phone number of 916-808-7005.

39)    Eric Guerra, District 6, named in his individual capacity, with an address of 915 I Street, 5th Floor, Sacramento, CA 95814, and a phone number of 916-808-7006.

40)    Rick Jennings, District 7, named in his individual capacity, with an address of 915 I Street, 5th Floor, Sacramento, CA 95814, and a phone number of 916-808-7007.

41)    Mai Vang, District 8, named in her individual capacity, with an address of 915 I Street, 5th Floor, Sacramento, CA 95814, and a phone number of 916-808-7008.

**3.**    Housing Authority of the County of Sacramento ("COUNTY") and it's executives

42)    COUNTY has no listed address or phone number other than 801 12th Street, Sacramento CA, 95814, the same as SHRA.  COUNTY is being named in it's official capacity, as the organization responsible for the COUNTY PHA plan. COUNTY members are listed on SHRA website (https://www.shra.org/transparency/board-agenda/) and are ultimately responsible for policy and practice documents in use by SHRA.

6

Roberts v. Sacramento Housing and Redevelopment Agency, 4th Amended Complaint - 2:22-CV-01699-DJC AC

43)    Phil Serna, District 1, named in his individual capacity, with an address of 700 H Street, Suite 2450, Sacramento, CA 95814, and a phone number of 916-874-5485.

44)    Rich Desmond, District 3, named in his individual capacity, with an address of 700 H Street, Suite 2450, Sacramento, CA 95814, and a phone number of 916-874-5471.

45)    Sue Frost, District 4, named in her individual capacity, with an address of 700 H Street, Suite 2450, Sacramento, CA 95814, and a phone number of 916-874-5491.

46)    Pat Hume, District 5, named in his individual Capacity, with an address of 700 H Street, Suite 2450, Sacramento, CA 95814, and a phone number of 916-874-5465.

47)    CITY and COUNTY are collectively referred to as "BOARD".

**4.    DOES 1-100**

48)    The identities and complete involvement for some individuals in the acts within this complaint are unknown.  As best as we can identify them, they will be referred to as "UNKNOWN" with a unique number.

**5.    Unnamed Parties**

49)    BOARD receives policy and procedure recommendations from a group appointed by the CITY and COUNTY individually.  It does not appear that the SHRA Commission or Resident Advisory Boards have any rule making power regarding the policy and procedures within SHRA.  Notation of SHRA Commission and/or Resident Advisory Board activity within this complaint will be collectively referred to as "COMMISSION".

**6.    Other Parties**

50)    Ashley Valentine ("VALENTINE") was employed as a case worker for Sacramento Self Help Housing ("SSHH"), who provided housing wrap around services, property related tenant services ("PRTS") for the County of Sacramento's

7

Permanent Supportive Housing ("PSH") program.

51)    The PSH program was targeted to reduce the chronically homeless and disabled homeless population in Sacramento County. In 2018, FAMILY received their HCV voucher through the PSH program, and as part of the PRTS services, VALENTINE was responsible for coordinating voucher related issues with SHRA.

52)    As part of the PSH program, SSHH established master leases with housing providers and provided those units to program participants. In March 2022 and September 2022, the County of Sacramento discontinued funding for the PSH program, including the PRTS services from VALENTINE.

## III.    JURISDICTION AND VENUE

53)    This action arises from violations of the Civil Rights Act ("1983") 42 U.S. Code §1983, the Americans with Disabilities Act and Amendments ("ADA") Title II, Rehabilitation Act of 1973 and Amendments ("REHAB") §504, Fair Housing Act and Amendments ("FHA") 42 U.S. Code §3613 et seq., and the 14th Amendment ("14TH") due process and equal protection clauses.

54)    Further cause for action comes from the California Fair Employment and Housing Act ("FEHA") Ca Gov Code §12940, et seq., Ca Gov Code §12955 et seq., California Unruh Civil Rights Act ("UNRUH") Ca Gov Code §51, and Ca Gov Code §815.2 against all named individuals for discriminatory acts and civil rights violations.

55)    This court is the proper venue as all acts occurred within the county of Sacramento, California, all Plaintiffs reside in the county of Sacramento, CA, and all Defendants currently do business in the county of Sacramento, California.

56)    This court is the proper venue due to violations of the constitution, federal statutes, and federal regulations.

## IV.    COMPLAINT

### 1.    Denial of reasonable accommodation

**A.**    May 17, 2022 Reasonable Accommodation Request

8

57)    On May 17, 2022, DAVID called the SHRA information line to, among various topics, request an adjustment to subsidy standards a reasonable accommodation (requested an extra bedroom allotment to the voucher).  In the conversation with supervisor "UNKNOWN 1", DAVID clearly stated this was request was for disability related purposes, which "UNKNOWN 1" refused outright.  When DAVID asked what he needed in order to get the accommodation approved, "UNKNOWN 1" stated that FAMILY was lucky the voucher wasn't being canceled outright.

**Harm**

58)    Because "UNKNOWN 1" denied FAMILY's reasonable accommodation request it denied them equal opportunity to use as non-disabled family.  The lack of accommodation continues to result in a lack of appropriate setting for medical treatment, education, employment and general enjoyment for both DAVID and AIMS, which the requested accommodation would provide.

59)    The denial of reasonable accommodation resulted in a significant amount of emotional distress and anxiety, and threatens to harm AIMS development for the rest of her life.  Because "UNKNOWN 1" did not engage in an interactive dialog with FAMILY before denying the accommodation, it made it unclear whether FAMILY had any rights at all.

**B.**    May 19, 2022 Reasonable Accommodation Request

60)    On May 19, 2022,  FAMILY on recommendation from VALENTINE submitted a written Reasonable Accommodation request with SHRA.  The "official" SHRA request form included a release of authorization form, which was filled out and signed on the same day, and included a copy of our medical records.

61)    FAMILY was advised that the accommodation could not be approved without a doctor's note.  FAMILY requested the specific language required for the note on request from their doctor, and provided that note on May 31, 2022.

62)    Between May 19, 2022 and July 15, 2022 when the family received a letter

9

denying the reasonable accommodation request, SHRA did not contact the FAMILY or their physician, or engage in the interactive process process in any form.

63)    The FAMILY made twice weekly calls to SHRA, MACIAS, and the reasonable accommodation phone number which had a voicemail message by PAULSON, to initiate the interactive process, all of which were either full voicemail boxes, or lack of response.

64)    The only attempt SHRA or PAULSON made to contact FAMILY before denying the reasonable accommodation request was a letter dated June 20, 2022 and received June 27, 2022 requesting the FAMILY submit the same documents they had already submitted.  FAMILY left several voice mail messages at the telephone number listed in the letter between June 27, 2022 and July 15, 2022, none of which were returned.

65)    On July 15, 2022, the FAMILY received a letter from SHRA signed by PAULSON anddated July 08, 2022 stating the reasonable accommodation request had been denied for DAVID because SHRA believed an alternative accommodation may exist, and that SHRA is required by law to not make accommodations, and did not mention AIMS at all.

**Harm**

66)    This denial of reasonable accommodation prevented DAVID and AIMS from receiving integrated medical care for their disability related concerns, harmed the education and employment opportunities available to DAVID, and denied FAMILY use and enjoyment of housing opportunities as a family with non-disabled members.

C.    September 29, 2022 denial

67)    On September 26, 2022 and September 29, 2022 FAMILY mailed two separate letters via USPS certified mail requesting a set of accommodations for DAVID and AIMS, including modifications to subsidy standards, effective

10

communication requirements, and reasonable modifications. FAMILY provided AIMS medical records as verification of disability and requested SHRA contact them to engage in the interactive process.

68)    FAMILY made several calls and sent several emails to SHRA in an attempt to engage in the interactive process, none of which were replied to. At no point between September 26, 2022 and November 22, 2022, when the FAMILY received a denial letter from SHRA signed by PAULSON, did anyone at SHRA attempt to contact the family or their physicians to engage in the interactive process.

69)    The denial further failed to address any of the other accommodations or modifications, appearing to be a copy and paste of the determination from the previous denial with a new date and addressed slightly differently.

**Harm**

70)    This denial of reasonable accommodation prevented DAVID and AIMS from receiving integrated medical care for their disability related concerns, harmed the education and employment opportunities available to DAVID, and denied FAMILY use and enjoyment of housing opportunities as a family with non-disabled members.

71)    SHRA was aware that FAMILY was attempting to move to suitable housing, and endured further emotional harm, humiliation, and stress due to being served an unlawful detainer for their housing as the lease expired and suitable housing could not be found.

**D.**    March 13, 2023 Reasonable Accommodation Request

72)    On March 13, 2023 FAMILY submitted a reasonable accommodation request via email to HENLEY for services to assist them with meeting the program requirements.

73)    On March 20, 2023 SHRA denied the request without engaging in the interactive process, while appearing to retroactively approve the previously denied May 19, 2022 reasonable accommodation request. Again, SHRA made no attempt

11

to engage in the interactive process with the FAMILY before issuing either proclamation, and despite the supposed approval of the May 19, 2022 request, has yet to actually provide a voucher indicating the change in standards reflected. SHRA via HENLY later revoked the payment standards change after FAMILY declined to terminate their request for informal hearing regarding the denials.

**Harm**

74)     This denial of reasonable accommodation prevented DAVID and AIMS from receiving integrated medical care for their disability related concerns.  Due to the repeated denials and housing instability resulting from them, AIMS has lost nearly a year of occupational, behavioral, and speech therapy, which may have permanently harmed her developmental progress.

75)     The denials also harmed the education and employment opportunities available to DAVID, and denied FAMILY use and enjoyment of housing opportunities as a family with non-disabled members, and continue to result in emotional harm, humiliation, stress, and anxiety for the all members of FAMILY.

    **E.**     April 3, 2023 retroactive reasonable accommodation denials

76)     On April 3, 2023 HENLEY delivered a letter via email signed by PAULSON denying all previous requests, including presumably the March 20, 2023 letter.  The denial claims that "no nexus" was found for "two bedrooms each", something which not only overrode without any explanation the prior finding of a nexus, but wasn't actually requested at all.  If this was the result of a miscommunication, the interactive process would have resolved the issue before the denial.

77)     FAMILY found suitable housing and paid holding deposits for a housing unit on March 29, 2023, and signed a RFTA on April 2, 2023, finally having the possibility of housing stability after almost one year of reasonable accommodation denials.

78)     This decision has apparently been reversed, and as of the time of this filing,

SHRA had not even scheduled, let alone completed an HQS inspection despite HUD guidelines recommending no more than fifteen days to do so.

79)    Included in the request was a denial of effective communication via email reasonable accommodation because "In most instances, communication is directed to the head of household, Sydney Roberts."  SHRA has communicated exclusively with DAVID, and DAVID has made it clear he requires the effective communication accommodation to fully access the program and services. PAULSON and SHRA made this decision without attempting to engage in the interactive process with the FAMILY.

**Harm**

80)    FAMILY continues to experience housing instability, loss of access to integrated medical care for DAVID and AIMS, and loss of access to occupational, speech, and behavioral therapy for AIMS. FAMILY continues to deal with the emotional harm, stress, and potentially life altering developmental delays due to the discrimination by SHRA, PAULSON, and HENLEY.

**CAUSE**

81)    FAMILY is entitled to relief under 1983 for deprivation of rights and disability and housing discrimination through sections of FHA, REHAB, and ADA for all reasonable accommodation denials.

82)    Family is entitled to relief under FEHA and UNRUH for all disability and housing discrimination acts.

**RELIEF**

83)    A declarative judgment stating denying reasonable accommodation for qualified disabled individuals without participating in the interactive process in good faith is disability and/or housing discrimination.

84)    $103,591 in penalties against SHRA, MACIAS, LYNCH, PAULSON, HENLEY, and "UNKNOWN 1" for each act of disability discrimination under the ADA, or $207,183 if prior violations exist.

13

85)    $115,054 in penalties against SHRA, MACIAS, LYNCH, PAULSON, HENLEY, and "UNKNOWN 1" for each act of housing discrimination under the FHA, or $230,107 if prior violations exist.

86)    Penalties in ¶62, ¶63 against each member of BOARD and DOZIER for failing to enact policies and practices to prevent the above discrimination.

87)    $500,000 in compensatory and punitive damages per discriminatory act.

88)    Prominent signage in the lobby of all buildings owned or operated by SHRA containing language describing the right to reasonable accommodation for qualified individuals, how to request reasonable accommodation, and explaining the right to private action if accommodation is denied.

89)    All other remedies the court determines just and proper, including costs, fees, and expenses.

## 2.    Due Process Violations

### A.    First Hearing

90)    On July 8, 2022 SHRA in a letter signed by PAULSON, denied a request for reconsideration of payment standards as a reasonable accommodation for the FAMILY.  The FAMILY attempted to request an informal hearing regarding the decision, including contacting the phone number listed on the denial letter, which instructed the caller to not leave a voice mail and hung up.  The FAMILY made repeated requests via calls to the SHRA HCV information line, calls to MACIAS, email, and even fax to request an informal hearing regarding the denial.

91)    SHRA refused to grant any due process until FAMILY reached out to Sacramento County Supervior Patrick Kennedy's office to ask for assistance in obtaining an informal hearing on August 26, 2022.

92)    On August 28, 2022 an SHRA representative notified FAMILY via email that an informal hearing regarding the payment standard reasonable accommodation denial has been scheduled for September 12, 2022 at 10:00 am. FAMILY requested a full set of hearing instructions to prepare, and received no

14

response.

93)    On September 6, 2022 FAMILY received a letter from SHRA backdated to August 26, 2022 from HENLEY with a list of hearing instructions.  Among the hearing instructions was that FAMILY was not allowed to present any evidence challenging the denial, that we were required to notify SHRA of representation ten days before the hearing.

94)    FAMILY attempted to contact SHRA via the reasonable accommodation information number listed on the instructions to request a copy of all documents to be presented, including their complete case file, but again were met with a voicemail box instructing callers to not leave a voice mail message after which it disconnected.

95)    On September 12, 2022 FAMILY joined the informal hearing via Zoom, in which CRUZ represented SHRA and John Lew ("LEW") was the hearing officer. After requesting all of their documents again including their case file, CRUZ stated that they were not available, and presented only a screen-share of the documents they intended to present at the hearing.

96)    At the conclusion of the hearing, which LEW requested both parties submit a written brief to him, and asked us to submit it to ra@shra.org and SHRA would append their brief and forward it to him.  He then stated that his written decision would be issued within two weeks, and gave no indication there would be any issues completing the hearing process.

97)    On September 12, 2022 FAMILY submitted the brief to ra@shra.org, requesting SHRA reach out to the family via email if any concerns arose. FAMILY received no response until September 15, 2022 when CRUZ called the family and informed them that SHRA had vacated the hearing, and they would contact us at some future time to reschedule.  FAMILY stated they did not agree with this and asked for a reason, to which CRUZ stated there was none.

98)    On September 15, 2022 FAMILY submitted via email and USPS certified

15

letter an objection to the hearing being vacated without explanation, noted the regulations which required a decision to be rendered, and stated we expected a decision to be delivered in accordance with those regulations.  No response was received from SHRA until December 9, 2022 when HENLEY responded claiming to be "out of the office", and stating again that the hearing would be rescheduled "some time in January".

99)    On February 1, 2023 FAMILY again contacted ra@shra.org inquiring about the status of the hearing, to which HENLEY responded that they did not have a hearing officer available, and would reschedule at some point in the future.  At this point, multiple payment standard requests had been denied and it was unclear which one this hearing would actually cover.  FAMILY responded to HENLEY asking for clarification, HENLEY did not respond.

100)  On March 6, 2023 FAMILY again reached out to ra@shra.org requesting the status of the hearings, and requesting clarification on which denial the hearing would cover.  HENLEY responded on March 9, 2023 stating "We are very close to being able to reschedule the Informal Hearing" and requested FAMILY fill out another set of medical release forms.

**B.**    Second Hearing

101)  On April 4, 2023 HENLEY responded to FAMILY with another reasonable accommodation denial letter, and a notice that an informal hearing would take place on April 20, 2023 at 3:00pm.  FAMILY responded to the notice requesting a copy of their case file, a copy of the evidence to be presented at the trial, access to individuals involved in the denial for questioning, and a voice to text or real time text service as a reasonable accommodation for DAVID.

102)  FAMILY emailed DOZIER, LYNCH, PAULSON, and HENLEY on April 18, 2023 noting that SHRA still had not taken any steps to ensure they were in compliance with due process requirements for the hearing including providing a copy of the FAMILY case file, provided any documents for discovery, nor

16

confirmed that their effective communication accommodation would be granted.

103)   Still on April 18, 2023, HENELY responded with a set of documents which included their meeting notes and denial letters, but did not contain the case file or any documentation regarding what information SHRA used in reaching it's decision to deny the payment standards requests.  FAMILY responded again noting these documents were missing, asking for clarification about what the hearing would cover, verifying that an electronic copy of the hearing would be available, and requesting a transcript of the hearing.

104)   FAMILY also provided several documents they intended to submit, including emails supporting and communications with our doctor supporting our assertion that neither we nor our physician had been contacted prior to the denial. We also intended to present the email messages from HENLEY which demonstrated SHRA, PAULSON, LYNCH, DOZIER, and HENLEY were fully aware that due process was being denied due to lack of hearing officer.

105)   FAMILY received no response to their requests but DAVID attended the Zoom Hearing on April 20, 2022 at 3:00pm attended by LYNCH and CRUZ representing SHRA and D'Jon Paul Scott-Miller ("MILLER") of the Alameda Housing Authority acting as hearing officer.  When entering the hearing room, it gave an audio alert that the meeting was being recorded.

106)   FAMILY immediately asked for verification that the hearing was being recorded, that it would be made available after the hearing, and asked whether a transcript would be made available.  CRUZ responded that the hearing was being recorded and a digital copy of the hearing would be made available following the hearing.  CRUZ failed to respond regarding the transcript.

107)   We then noted for the record that our reasonable accommodation request had not been met, and that we were attempting to use our own software but it may delay the proceedings.  CRUZ and MILLER acknowledged.

108)   DAVID noted that they had not received a copy of their case file, nor any

17

records from SHRA which demonstrated how they came to the decision to deny the requests. DAVID noted that we still weren't sure which request the hearing was intending to cover, and these were serious due process issues.

109) CRUZ then informed DAVID they needed to put the meeting on hold and removed him from the hearing for more than five minutes. When DAVID was invited back into the hearing, he inquired whether the hearing was still being recorded after being removed to the lobby, as there were concerns about the conversations between MILLER, CRUZ, and LYNCH and whether there was any semblance of impartiality left.

110) CRUZ and MILLER confirmed that the complete hearing was recorded, including the interim period when DAVID was placed in a lobby. CRUZ then stated that to protect the FAMILY due process, they were going to cancel the hearing. DAVID objected and asked why CRUZ was even able to make this decision unilaterally, and why MILLER allowed removal to a lobby and cancellation of the hearing when MILLER, as hearing officer, was supposed to be running the hearing.

111) MILLER responded that they agree with CRUZ decision to cancel the meeting to "protect" FAMILY due process. DAVID asked why FAMILY was not at least consulted regarding the decision and stated they were ready to proceed despite the case file. MILLER again indicated that it was CRUZ who was in control of the hearing. DAVID then asked whether there was any objection, appeal, or other mechanic of due process to prevent the cancellation to which MILLER and CRUZ stated there was not.

112) CRUZ then stated that the hearing would be rescheduled for some time in the future. DAVID asked when, however CRUZ could provide no timeline instead offering that DAVID could reach out to SHRA to reschedule and the hearing concluded.

113) SHRA, PAULSON, CRUZ, LYNCH, and/or MILLER have not provided a

18

written decision, indicated they would, nor provided the digital copy of the hearing or transcript.

**Harm**

114)   Above and beyond the harmful effects of the discrimination noted in ¶58, ¶59, ¶66, ¶70, ¶71,¶74, ¶75, and ¶80, Defendants have chosen to strip the fundamental right to fairness from FAMILY.

115)   Defendants deliberate indifference to the constitutionally protected rights of FAMILY, going as far as denying due process under the guise of protecting due process is extraordinarily bad faith and cynical.

116)   As recently as August 11, 2022, preceding the acts in this section, Defendants were made aware via summary judgment in ED California courts, that denial of informal hearing is a violation of due process, yet still subjected the family to housing instability and discrimination which could have been addressed in the informal hearing process.

**Cause**

117)   The FAMILY has cause for action through 1983.

**Relief**

118)   Punitive damages in the amount of $500,000 against SHRA, DOZIER, and PAULSON individually.

119)   Punitive damages in the amount of $500,000 against CITY and COUNTY in their official capacity.

120)   Punitive damages in the amount of $250,000 against HENLEY, CRUZ, and LYNCH individually.

121)   Compensatory damages against SHRA, DOZIER, PAULSON, HENLEY, CRUZ, and LYNCH in the amount of $500,000.

122)   All fees and costs required to pursue this complaint including costs, fees, and expenses.

**3.    Discrimination Based on Disability Type**

19

124)   In letters dated July 8, 2022, November 16, 2022, March 20, 2023, and April 03, 2023 PAULSON denied reasonable accommodation requests by the family based solely on their disability type.

125)   SHRA policy documents approved by BOARD allow the same type of accommodations to be granted to individuals with particular types of disabilities, for example individuals with hearing impairments or who require durable medical equipment.

126)   Across many interactions with SHRA, PAULSON, LYNCH, and HENLEY they have confirmed that this is a blanket policy which disallows them from considering accommodation requests on a case by case basis.

**Harm**

127)   FAMILY experienced the same harms for these acts as those in ¶58, ¶59, ¶66, ¶70, ¶71,¶74, ¶75, and ¶80.

**Cause**

128)   Causes for these acts are the same as those in ¶81, ¶82.

**Relief**

129)   FAMILY requests as relief the same as noted in ¶84 through ¶89.

130)   Declarative relief stating offering a reasonable accommodation to only specific classes of qualified individuals rather than evaluating the appropriateness of a request on a case by case basis may constitute both housing and disability discrimination.

**4.    Denial of Access to Services**

131)   SHRA, DOZIER, PAULSON, MACIAS, and CRUZ have on numerous occasions, explicitly denied access to services by refusing to communicate by phone, email, in person, or even fax.

132)   Between May, 2022 and November 2022, FAMILY attempted to gain access to the SHRA lobby in order to deliver documents, obtain status regarding their case, and discuss outstanding issues.  The lobby and all access to case workers was

20

barred by literal bars around the facility.  The only way to deliver documents during this time was via a drop box located outside the building near the street, resulting in SHRA assertions that documents had not been transmitted.

133)   PAULSON and HENLEY have issued formal denials of effective communication requests on multiple occasions, including as recently as April 03, 2023 in which PAULSON signed a letter denying communication via email with FAMILY.

134)   PAULSON, MACIAS, and "UNKNOWN 3" ("Reasonable Accommodation Committee") between June 2022 and November 2022 refused to answer any phone call or return any voicemail messages to FAMILY, despite or probably because of several outstanding issues with their case.

135)   SHRA, and MACIAS refused to return phone calls or directly discuss any case information to requests left on their website, canceling online meeting requests, closing call back requests without calling back, or leaving requests open for months to prevent registering new requests.

136)   PAULSON, DOZIER, LYNCH, and CRUZ repeatedly fail to allow reasonable accommodation, or access to due process challenging those refusals.

137)   SHRA, through delays in it's Housing Quality Standards ("HQS") inspection process induces delays which prevent access to housing opportunities, particularly those in non-economically disadvantaged areas.  In our case, more than a month has passed since our potential landlord submitted a Request For Tenancy Approval ("RFTA"), which acknowledges the availability of a unit for rent.  From this stage, SHRA must schedule an inspection before deciding whether or not to approve rental subsidies on the unit.

138)   While this is apparently a typical delay for SHRA, there is also discrepancy in HQS inspection lag time based on the payment standards in a particular ZIP code.  ZIP codes with higher payment standards can take nearly twice as long as inspections in economically disadvantaged ZIP codes.

21

**Harm**

139)   FAMILY has experienced denial of protected rights due to the polices and systematic practices at SHRA.  FAMILY has also experienced emotional harm, stress, and humiliation due to repeated frustrated attempts to access services.  This denial of access to services has directly resulted in housing instability for the family.

140)   FAMILY, and the general public experience considerable harm to deconcentration of poverty and homelessness reduction goals which are some of the stated objectives of the HCV program.  Prospective landlords and tenants are harmed, including FAMILY due to delays which cause significant economic burden or induce housing instability.

**Cause**

141)   Cause for action exists under 1983, FHA, ADA, FEHA, and UNRUH.

**Relief**

142)   Injunction ordering SHRA to make lobby spaces accessible to all individuals, and to comply with accessibility requirements in 28 CFR § 35.150.

143)   Injunction ordering SHRA to comply with regulation requiring effective communication with all members of recipient families, including to communicating via email consistent with 28 CFR § 35.160 and 28 CFR § 35.161.

144)   Injunction ordering an assessment of compliance with FHA and ADA compliance requirements by an outside agency of FAMILYs choice.

145)   $500,000 in compensatory damage from CITY, COUNTY, BOARD, SHRA, DOZIER, and PAULSON.

146)   $500,000 in punitive damages against CITY, COUNTY, and SHRA.

147)

**5.    Discrimination Based on Family Composition**

147)   As a stated policy in it's PHA Plan, composed by BOARD, SHRA states that it may reserve the right to force families who add members into under housed

status at their discretion.

148) The BOARD policy, administered by SHRA, states that foster children, court ordered placements, or adoptions may not qualify for a change in payment standards to accommodate the family, acknowledging in the text of the policy that this will force families into an under-housed state.

149) It further demands that any such changes in family status be pre-approved by SHRA.

**Harm**

150) FAMILY has a vested interest in being able to adopt and or accept wards with disability needs similar to their own. There is a severe shortage of families with the required experience to navigate the difficult array of needs for these children. By placing blanket bans on the ability of families like ours to explore options without risk of being intentionally placed in an underhoused environment, it places a chill on our families rights based purely on our familial status.

151) Further, this blanket policy ensures that avoiding the type of institutionalization and lack of environmental integration that post Olmstead efforts is chilled, reducing the options available to disabled children.

**Cause**

152) Cause for relief exists under 1983, FHA, and FEHA. We also believe cause may exist more generally under ADA and REHAB.

**Relief**

153) Declarative judgment stating denial of rights and privileges to families based on familial status constitutes housing discrimination under the FHA.

154) Injunctive judgment against the enforcement of any SHRA policy which seeks to limit access to services based on family composition or disability status.

155) Punitive damages against BOARD and SHRA for $500,000.

156) All other remedies the court determines just and proper, including costs, fees, and expenses.

23

Roberts v. Sacramento Housing and Redevelopment Agency, 4th Amended Complaint - 2:22-CV-01699-DJC AC

**6.  Retaliation for Reasonable Accommodation and Due Process**

157)  On March 20, 2023 PAULSON signed a letter from SHRA stating that they would offer an extra bedroom "so that both David and [AIMS] have separate sleeping rooms". HENLEY offered this apparently contingent upon FAMILY dropping the request for informal hearing regarding the reasonable accommodation denial. FAMILY declined, as the offer did not resolve the issues with the reasonable accommodation denial process, nor did it create any assurances the behavior would not be repeated in the future.

158)  The FAMILY found a landlord willing to rent a housing unit and signed a holding agreement on March 28, 2023. The landlord submitted an electronic RFTA on April 2, 2023, and was signed by FAMILY the same day. On April 3, 2023 FAMILY requested an expedited HQS inspection and provided as proof of urgency copies of two current unlawful detainer actions, both more than two months old, filed against their current address.

159)  HENLEY responded on April 3, 2023 with a letter signed by PAULSON stating our reasonable accommodation requests have been retroactively denied, and further that previously requested accommodations, including those for effective communication had also be denied.

160)  On April 4, 2023 HENLEY responded stating that SHRA will expedite the HQS inspection, but claimed the RFTA was not complete and had other issues. After checking with prospective landlord and verifying that the document was correctly filled out, we responded to HENLEY that all appeared to be correct.

161)  On April 16, 2023, the prospective landlord emailed FAMILY to alert them they contacted SHRA and were informed the HQS inspection was not being expedited, and that despite two weeks having already passed, there was no inspection scheduled.

162)  On April 17, 2023 we again reached out to HENLEY regarding the lack of inspection or expedited status, and they failed to respond to the issue.

24

163) HUD guidelines call for the complete HQS inspection and HAP certification to take no more than fifteen days, SHRA has already significantly exceeded this recommendation and has yet to even order an HQS inspection.

164) As of the time of this filing, the landlord has been required to hold the unit without payment for a month, and SHRA, having evidence of eviction, has still failed to order the inspection, or the HAP contract process which is still to follow.

165) The extended length of time it takes to order inspections and execute HAP contracts based payment standards in a particular ZIP Code are retaliatory due to the attempt to chill the selection of housing options in less economically disadvantaged areas.

**Harm**

166) The family has experienced two sets of harm due to retaliatory actions by Defendants. First, FAMILY continues to experience housing instability, aggravating the harms in ¶58, ¶59, ¶66, ¶70, ¶71,¶74, ¶75, and ¶80. Because of this retaliation against FAMILY, they have already suffered loss of reputation with their prospective landlord, and continue to suffer the humiliation of making appointments and meetings with service providers which have had to be canceled.

167) The second class of harm comes as a result of retaliatory policies designed to force the family into areas where concentration of poverty is prevalent. The clearly disparate inspection timelines based on ZIP Code/payment standards, particularly given SHRA, DOZIER, PAULSON, LYNCH, and CRUZ awareness of why this extended inspection period would cause extra harm to FAMILY, has resulted in an extreme amount of emotional distress for every member of the family.

**Cause**

168) Cause for action comes from 1983, and anti-discrimination components of FHA, ADA, REHAB, FEHA, and UNRUH.

**Relief**

25

169)   For the deliberate indifference of these practices, FAMILY requests $1,000,000 in compensatory damages from SHRA, DOZIER, PAULSON, LYNCH, and CRUZ.

170)   For failure to correct this longstanding pattern of retaliation and discrimination, FAMILY asks $500,000 in compensatory damages from CITY, COUNTY, and each member of BOARD.

171)   To prevent future occurrences of these acts, and because of the Defendants significant history and commitment to engaging in them, FAMILY asks $1,000,000 in punitive damages from SHRA, DOZIER, PAULSON, LYNCH, CRUZ, CITY, COUNTY, and each member of BOARD.

172)   Mandatory training by a vendor approved by FAMILY from the HUD list of vendors for all employees of SHRA on the history and intent of the HCV/Section 8 program, and separate training selected by FAMILY from the HUD list of vendors for all SHRA employees on anti-discrimination and anti-retaliation components of FHA, REHAB, ADA, FEHA, and UNRUH.

173)   All other remedies the court feels appropriate, including costs, fees, and expenses.

**7.    Discriminatory Policies and Failure to Prevent Discrimination**

174)   CITY and COUNTY each independently create a "PHA Plan", or set of policies and practices that SHRA and it's employees must adhere to in the execution of their duties.  These PHA Plan documents CITY and COUNTY cover the Housing Authority of the City of Sacramento, and Housing Authority of the County of Sacramento respectively, and only CITY and COUNTY can modify the policies within them.

175)   CITY and COUNTY consult with a COMMISSION whose members represent the CITY and COUNTY in public meetings, however the COMMISSION has no direct rule making authority with regard to any PHA Plan. CITY and COUNTY also consult with an appointed Resident Advisory Board,

which like all other members of COMMISSION have no direct rule making authority with regard to PHA Plan content.

176)  It is the responsibility of BOARD as individuals, and through their position within CITY and COUNTY, to ensure the PHA Plans do not contain policies which are discriminatory.

177)  It is further the responsibility of SHRA and it's employees, in executing the combined PHA Plan policies to ensure that they actively attempt to correct any policy or practice which is discriminatory.

178)  The combined PHA Plan documents have many instances of polices which are discriminatory based on disability, disability type, and familial composition.

179)  Chapter Five of the 2022 version of both PHA Plans for example explicitly only allows payment standard adjustments for room size for disabilities which require "durable medical equipment" or "live-in aides".  It further discriminates by requiring the aide to be a permanent live-in aide and explicitly disallows rotating services like shift based nursing.

180)  Both the CITY and COUNTY drafted plans contain similar instances in which allows SHRA to deny any reasonable accommodation as a blanket policy if there is an expectation that too many individuals may require it.

181)  The CITY and COUNTY plans even explicitly state they have the right to force families into an under-housed state (jeopardizing their subsidy assistance) for adding family members, even in instances when those additions are court ordered or by birth/adoption.

182)  CITY, COUNTY, and SHRA have had numerous opportunities to correct these deficiencies, both through extensive training sessions offered by HUD, external training sessions forced upon them through their participation in voluntary compliance agreements, and through numerous judgments against them over the past decade regarding these practices.

183)  Despite the overwhelming awareness provided to BOARD, CITY,

27

COUNTY, SHRA, and it's employees of the potential violation of law that these policies represent, no effort has been made to correct them.

184) BOARD, representing CITY and COUNTY, has entered SHRA into multiple voluntary compliance agreements since 2020 explicitly agreeing to prevent discrimination based on disability, housing, retaliation to occur, and has agreed in these agreements to ensure that due process is protected for all recipients.

185) These agreements, signed by DOZIER and administered in the HCV program by PAULSON, LYNCH, and CRUZ, have failed to produce any policy or practice change.

186) These systemic discriminatory policies and practices, currently written into the PHA Plan documents at the time of this filing in 2023, serve only to intentionally deprive FAMILY, and all recipients, of the rights and privileges afforded to them.

**Harm**

187) The BOARD, CITY, COUNTY, SHRA, DOZIER, PAULSON, LYNCH, CRUZ, and MACIAS have all denied the family equal protection, due process, or access to protected rights and privileges, resulting in significant emotional distress, loss of access to housing, medical, and employment options, and exacerbating pain and suffering due to disabling symptoms.

188) This failure and indifference regarding correction of this discrimination may permanently harm the development of AIMS, who is in a critical developmental window, has exacerbated the stress symptoms experienced by DAVID and SYDNEY, and have reduced the enjoyment and quality of life of DAYS.

189) Perhaps far worse than these, is that Defendants policies are targeted against all disabled individuals in particular, harming their ability to achieve the equal opportunities our laws and constitution have attempted to create for them.

190) These policies, and the Defendants indifference toward correcting them are a direct attack on the individuals who are often the least able to advocate for

28

themselves and most likely to experience discrimination as a whole.  They serve to sacrifice the rights and privileges of the most vulnerable to compensate for policy failures in unrelated areas.

**Cause**

191)  Cause for this item comes from 1983, ADA, REHAB, FHA, and FEHA.

**Relief**

192)  Family requests compensatory damages of $1,000,000 against all Defendants.

193)  Family requests punitive damages of $1,000,000 against all Defendants.

194)  Family requests training for SHRA and it's employees consistent with ¶172.

195)  All other remedies the court determines appropriate including fees, expenses, and costs.

Roberts v. Sacramento Housing and Redevelopment Agency, 4th Amended Complaint - 2:22-CV-01699-DJC AC