FILED

SEP 0 1 2026

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY DEPUTY CLERK

David Samuel, Pro Se
Sydney Roberts, Pro Se
Plaintiffs
108 Rinetti Way
Rio Linda, CA 95673
512-522-8571
edfed@possiblymaybe.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SYDNEY ROBERTS,
DAVID SAMUEL,

Plaintiffs,

v.

SACRAMENTO HOUSING AND REDEVELOPMENT AGENCY, ET AL.,,

Defendants

Case No: 2:22-cv-01699 DJC AC

**PLAINTIFFS' MOTION FOR ADMINISTRATIVE RELIEF UNDER LOCAL RULE 233 AND REQUEST FOR PRIOR APPROVAL UNDER LOCAL RULE 230(M) TO SUBMIT EVIDENCE OF A POST-FILING EVENT REGARDING ECF NO. 179**

1) Plaintiffs Sydney Brooke Roberts and David Tyrone Samuel respectfully move under Local Rule 233 for an order granting the prior approval required by Local Rule 230(m) to file the proposed Notice of Post-Filing Event and Supplemental Declarations attached as Exhibit 1, together with Exhibit A, the Microsoft Teams-generated transcript. The August 26, 2026 meeting occurred after Plaintiffs signed and served their reply concerning ECF No. 179 and completed the factual sequence already presented in that motion. Plaintiffs request no new claim, no second merits brief, and no reopening of discovery.

**I. RELIEF REQUESTED**

2) Plaintiffs request an order granting prior approval under Local Rule 230(m),

accepting Exhibit 1 and its Exhibit A solely as a factual update concerning the August 26 meeting, and granting any narrower alternative relief the Court considers appropriate.

**II. PROCEDURAL BACKGROUND AND TIMING**

3) ECF No. 179, filed August 7, 2026, seeks leave under Federal Rule of Civil Procedure 15(d) and modification under Rule 16(b)(4) concerning SHRA's March-August 2026 annual-recertification, head-of-household, accommodation, and communication process. The Court submitted the motion without oral argument. ECF No. 180.

4) The proposed supplemental complaint alleged that Plaintiffs successfully submitted their annual recertification on March 17 with Mr. Samuel designated as head of household; that SHRA reopened it on April 24 and directed a resubmission with Ms. Roberts restored to that designation; and that Plaintiffs repeatedly asked SHRA to identify the authority for its action and for the meeting it demanded. Plaintiffs requested remote access, effective communication, advance written identification of the issues, and an accurate meeting record or equivalent. ECF No. 179 at 78-84, proposed Suppl. Compl. ¶¶ 35-88.

5) By August 7, SHRA possessed the March submission digitally signed by both adult household members, their joined April 24, June 25, July 9, and July 24 writings, Ms. Roberts's express authorization for Mr. Samuel to communicate and participate, and Ms. Roberts's August 7 declaration under penalty of perjury confirming that she knowingly and voluntarily approved the designation change. SHRA had not identified a regulation, Administrative Plan provision, or written policy requiring a meeting. It

nevertheless had not yet scheduled or conducted the meeting when ECF No. 179 was filed.

6) Defendants filed their opposition on August 25, 2026. ECF No. 181. Plaintiffs signed and served their reply that day. The reply bears a filing date of August 26, and the Clerk entered it as ECF No. 182 on August 27. The SHRA meeting began at approximately 10:00 a.m. on August 26, after the reply had been signed and served. What occurred at the meeting, and the Microsoft Teams-generated transcript, did not exist when Plaintiffs prepared and served the reply.

## III. LOCAL RULE 233 IS THE PROPER VEHICLE

7) Local Rule 230(m) bars additional memoranda, papers, or other materials after a reply without prior Court approval, subject to exceptions not applicable here. Plaintiffs therefore seek approval before submitting the factual update. Local Rule 137(c) directs that a proposed document requiring leave be attached as an exhibit to the request for leave, so Plaintiffs attach the proposed filing as Exhibit 1.

8) Local Rule 233 supplies the procedure for miscellaneous administrative matters requiring a Court order. Plaintiffs invoke it only to obtain the administrative order required by Local Rule 230(m), not to decide the merits of ECF No. 179 or any new claim. The examples given in Local Rule 233 are illustrative and do not limit the rule to those matters. This motion states the requested relief, the reasons for it, the relevant background, and the affected parties' position, and is accompanied by a proposed order.

## IV. MATERIALITY TO THE PENDING MOTION

9) SHRA had described the meeting's purpose as verifying directly with Ms. Roberts that the designation change was voluntary and understood. The proposed declarations

establish that SHRA already possessed that confirmation repeatedly in writing before the meeting. They further establish that SHRA did not give advance notice that the meeting would address a hypothetical family separation, ownership of the voucher, relinquishment or surrender of assistance, bifurcation, or whether Ms. Roberts would give up her place in the home.

10) At the meeting, SHRA Assistant Director Kassie Slater addressed each of those subjects, and then stated that SHRA would make the requested "swap." The declarations and Exhibit A set out what was said.

11) That sequence matters to the scheduling relief requested in ECF No. 179. When that motion was filed, the meeting had not been scheduled. It has now occurred, after the reply record closed, and it completes the sequence on which the requested modification under Rule 16(b)(4) rests. Plaintiffs sought leave within days of the event.

12) Exhibit A preserves the Microsoft Teams-generated transcript, including the apparent transcription errors generated by that system. Those errors themselves bear on the accuracy limitations of the Teams transcript and on Plaintiffs' preexisting request for an accurate meeting record or equivalent. ECF No. 179 at 83-84, proposed Suppl. Compl. ¶¶ 77, 84.

13) Plaintiffs do not ask the Court through this administrative request to decide whether the meeting independently violated any statute or constitutional provision. The proposed supplement adds no party or claim and presents no additional legal argument on the merits of ECF No. 179. The Court may give the material whatever weight it deems appropriate.

**V. PROMPT PRESERVATION AND NO UNFAIR PREJUDICE**

14) Plaintiffs sent written notice concerning the meeting to SHRA and defense counsel on August 26. On August 27, Plaintiffs served a supplemental disclosure under Federal Rule of Civil Procedure 26(e) identifying Ms. Slater and the meeting subjects. Plaintiffs seek leave promptly after those preservation steps.

15) Defendants will receive the five-day opportunity to oppose under Local Rule 233(b). Plaintiffs submit declarations from both household participants who attended the meeting, including Ms. Roberts, to whom the questions were directed. Plaintiffs request no discovery enlargement and ask the Court to use the material only as a factual update, not to adjudicate in this administrative proceeding any disputed inference or new claim arising from the meeting.

**VI. AFFECTED PARTIES' POSITION**

16) On September 1, 2026, at 1:09 a.m. Pacific, Plaintiffs asked defense counsel whether Defendants oppose this request. At 10:08 a.m. that day, defense counsel responded: "Defendants oppose the motion on the grounds that the requested relief is based on improper grounds pursuant to LR 233." Counsel requested the proposed motion and stated that Defendants reserve the right to oppose on additional grounds after receiving it.

**VII. CONCLUSION**

17) Plaintiffs respectfully request the narrowly tailored administrative relief described above and in the separately lodged proposed order.

David Samuel

David Samuel September 1, 2026

Sydney Roberts

Sydney Roberts September 1, 2026

David Samuel, Pro Se
Sydney Roberts, Pro Se
Plaintiffs
108 Rinetti Way
Rio Linda, CA 95673
512-522-8571
edfed@possiblymaybe.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYDNEY ROBERTS,<br>DAVID SAMUEL,<br><br>Plaintiffs,<br><br>v.<br><br>SACRAMENTO HOUSING AND REDEVELOPMENT AGENCY, ET AL.,,<br><br>Defendants | Case No: 2:22-cv-01699 DJC AC<br><br>**SUPPLEMENTAL DECLARATION OF DAVID TYRONE SAMUEL REGARDING ECF NO. 179** |

1) I, David Tyrone Samuel, declare:

2) I am a Plaintiff in this action and proceed without counsel. I have personal knowledge of the facts stated here and, if called, could testify competently to them.

3) Sydney Brooke Roberts and I are adult members of the same household and participate with our children in SHRA's Housing Choice Voucher program. I am a person with disabilities. SHRA has long known of my disability status and of my requests for reasonable accommodation and effective communication.

4) I maintain the email accounts through which our household communicates with SHRA and manage our household's SHRA portal access. I personally sent, received, or obtained through the portal the communications described below. Copies of the March through July communications were submitted with ECF No. 179.

5) On March 17, 2026, the link in SHRA's annual-recertification notice did not work. I located SHRA's functioning Resident Portal and completed the household's annual recertification there. The submission designated me as head of household. Ms. Roberts and I both participated in, approved, and digitally signed the submission. The portal accepted the completed submission, and I notified SHRA in writing that same day that the submission had been completed successfully.

6) On April 24, 2026, SHRA reopened the March 17 submission. SHRA's portal message stated that the head-of-household designation did not match the original application and directed both Ms. Roberts and me to sign and submit the forms again with Ms. Roberts as head of household and me as spouse or partner. The message did not identify any missing information or other deficiency in the March submission.

7) About three hours later, Ms. Roberts and I responded jointly in writing to SHRA's Reasonable Accommodations address. We confirmed that the household designated me as head of household, requested that SHRA process that designation during the ongoing recertification, and asked SHRA to identify any additional form or step it required. We also asked SHRA to identify the regulation, Administrative Plan provision, HUD instruction, form requirement, or other written authority supporting its insistence on the prior designation. SHRA did not identify any such authority in response.

8) On June 25, 2026, SHRA directed Ms. Roberts to attend an in-person appointment on July 2. The notice described the subject only as a request received on April 24. It did not identify a defect in the March submission, any decision SHRA was considering, any authority requiring a meeting, or the issues that would be addressed.

9) Ms. Roberts and I responded jointly on June 25. We requested that any meeting

be conducted remotely, that SHRA communicate by email, that SHRA provide the issues and asserted authority in writing before the meeting, and that an accurate meeting record or equivalent be provided. Ms. Roberts expressly authorized me in that response to communicate with SHRA, receive voucher-related correspondence, submit requests and responses, participate in meetings, request accommodations, and represent the household concerning the recertification and head-of-household designation.

10) On July 9, 2026, SHRA sent a letter stating that the purpose of its requested meeting was limited to verifying directly with Ms. Roberts that changing the head-of-household designation was her voluntary request and that she understood the effect of the change. SHRA stated that it had to verify her wishes before making the change, but it did not identify a regulation, Administrative Plan provision, or written policy requiring a meeting. The letter stated that the requested change would be cancelled if SHRA could not verify Ms. Roberts's wishes or obtain information SHRA considered necessary.

11) The July 9 letter also redirected the disability-accommodation process to Ms. Roberts, although I am the household member whose disability was the basis of the communication and meeting requests. It enclosed a one-page reasonable-accommodation form prefilled with Ms. Roberts as head of household and asked whether she needed an accommodation to participate in an in-person meeting.

12) Ms. Roberts and I responded jointly on July 9, eighteen days before SHRA's stated deadline. We again asked SHRA to identify the authority requiring a meeting. We stated that, if SHRA nevertheless required one, Ms. Roberts would participate personally and confirm the designation directly and in her own words. We renewed the

requests for a remote meeting, effective communication, advance written identification of the issues, and an accurate meeting record or equivalent. SHRA acknowledged receipt that day but did not identify any authority requiring the meeting.

13) On July 23, 2026, SHRA offered either an in-person or virtual meeting and asked Ms. Roberts to select a format. SHRA continued to characterize email communication with me as a courtesy and again asked Ms. Roberts to complete its reasonable-accommodation form.

14) On July 24, 2026, Ms. Roberts and I selected the virtual option under protest and confirmed that we would both attend. We again stated that our participation did not concede that any meeting was required by HUD regulation, SHRA policy, or the Administrative Plan. We requested that, before the meeting, SHRA identify the specific issue to be decided, every asserted deficiency, the authority requiring the meeting, the authority permitting rejection of the March designation, and the person attending with authority to resolve the matter. SHRA did not provide that information.

15) On August 7, 2026, Ms. Roberts signed a declaration supporting ECF No. 179. She again stated under penalty of perjury that she had knowingly and voluntarily approved the submission designating me as head of household, that no one had pressured or coerced her, that she continued to authorize the change, and that she remained willing to confirm it directly to SHRA.

16) SHRA scheduled the meeting for August 26, 2026. On August 18, we asked SHRA in writing for a determination on the pending requests concerning an accurate record of the meeting and asked that representations material to the head-of-household request be provided in writing. SHRA did not provide the requested determination or the

requested written identification of the subjects that would be presented.

17) Before the August 26 meeting began, SHRA therefore already possessed the March submission digitally signed by both adult household members, the joint April 24, June 25, July 9, and July 24 writings, Ms. Roberts's express written authorization for me to participate and communicate, and her August 7 declaration under penalty of perjury. Each confirmed the requested designation and Ms. Roberts's voluntary approval. The meeting did not obtain a confirmation that SHRA lacked before the meeting.

18) Ms. Roberts and I attended the virtual Microsoft Teams meeting together on August 26, beginning at approximately 10:00 a.m. The Teams display identified SHRA's participant as Kassie Slater. Ms. Slater introduced herself as an Assistant Director at the Sacramento Housing and Redevelopment Agency. She was the only SHRA representative present.

19) At the outset, Ms. Slater stated that the purpose of the meeting was to ensure that the request came from Ms. Roberts, to confirm that Ms. Roberts wanted to make the change, and to explain what the change meant. Ms. Roberts said the first "OK" reflected in the Microsoft Teams-generated transcript after that explanation.

20) Ms. Slater then addressed Ms. Roberts about her status as head of household. She stated that Ms. Roberts was responsible for reporting income changes and the annual-recertification process, and that "the voucher in a sense is under your name and for lack of better words belongs to you."

21) Ms. Slater next introduced a hypothetical separation of the family. She stated that, if the family separated, SHRA would determine who the voucher would go to. I responded that we would contest that position even if there were a separation. When

the possibility of dividing the voucher between parents was raised, Ms. Slater stated, "we don't bifurcate the voucher."

22) Ms. Slater then carried the separation discussion into the pending head-of-household request. She stated that SHRA wanted Ms. Roberts to understand what the requested change would mean "as far as giving up the voucher." She then stated that SHRA wanted to ensure Ms. Roberts understood what it meant if she were "to relinquish" the voucher.

23) I questioned that characterization. I said to Ms. Roberts, "I need to add that to the complaint," which Teams rendered without the word "to." I also said, "Does she think I didn't know what relinquish means?" Ms. Slater responded twice that relinquish meant "to give up."

24) Ms. Slater then returned to Ms. Roberts and asked, "Would you like to switch the head of household to Mr. Samuel?" Ms. Roberts responded, "OK." Ms. Slater immediately reframed the question as, "It's a yes or no. Would you like to give up? OK." Ms. Roberts repeated the new question back: "Would you like to give up?" Ms. Slater answered, "Yes, that's that is what that is."

25) Ms. Slater then stated that Ms. Roberts "has to give up her space in the home to somebody else, OK?" I spoke the next household-side statement, which Teams rendered as, "You can continue using the language we have it what we need." What I said was that SHRA could not continue using that language. The Teams rendering reverses the meaning of my statement. I do not supply a reconstruction of the remainder of that line in Exhibit A.

26) The statements formed a continuous progression. Ms. Slater first framed the

voucher as belonging to Ms. Roberts individually, then introduced separation of the family and who would receive the voucher, then described the requested designation change as giving up or relinquishing the voucher, then restated the question whether Ms. Roberts wanted to change the designation as whether she wanted to "give up," and finally stated that Ms. Roberts had to give up her space in the home. Those were not separate answers to separate requests from us. They were the explanation Ms. Slater gave Ms. Roberts of what SHRA said the requested head-of-household change meant.

27) Ms. Roberts did not say yes to giving up the voucher. I did not hear her agree to relinquish or surrender the voucher, withdraw from the assisted family, leave the household, or give up her place in the home. Her request remained the same request both of us had signed in March and repeatedly confirmed in writing: change the designated head of household from Ms. Roberts to me while the family and household remained intact.

28) Near the end of the meeting, Ms. Slater stated, "we're gonna go ahead and we'll make that swap," and then stated, "We're going to make that swap." She instructed me about income and asset reporting obligations and stated that SHRA could send a copy of the family obligations. She ended the meeting by stating that she had needed to confirm with Ms. Roberts that this was what Ms. Roberts wanted to do.

29) Before or during the meeting, SHRA did not identify any regulation, Administrative Plan provision, or written SHRA policy requiring the meeting. SHRA did not give advance written notice that the meeting would address a hypothetical family separation, ownership of the voucher, relinquishment or surrender of assistance, bifurcation, or whether Ms. Roberts would give up her place in the home. Those

subjects were not part of the limited purpose stated in SHRA's July 9 letter.

30) Microsoft Teams generated a transcript of the meeting as it proceeded. I have reviewed it. Exhibit A reproduces the Microsoft Teams-generated transcript. It intentionally preserves the Teams wording as generated, including apparent transcription errors. Microsoft Teams identified Ms. Slater by name and labeled the device used by Ms. Roberts and me collectively as "David and Maddy (Unverified)." Exhibit A uses "Shared device" for those statements unless a declarant's personal knowledge establishes the speaker.

31) On August 26, 2026, we sent SHRA and defense counsel written notice concerning the meeting and preservation of records concerning it. On August 27, 2026, we served a supplemental disclosure under Federal Rule of Civil Procedure 26(e) identifying Ms. Slater and the subjects on which she may have discoverable information.

32) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 1, 2026, at Rio Linda, California.

David Samuel

David Samuel September 1, 2026

# EXHIBIT A

EXHIBIT — COURT-DRAFT COPY
MICROSOFT TEAMS-GENERATED TRANSCRIPT OF SHRA MEETING
August 26, 2026

Source:
Microsoft Teams transcript generated during the August 26, 2026 meeting.

Transcript method:
Microsoft Teams generated the transcript text during the meeting. The Microsoft Teams wording, including apparent transcription errors, is intentionally preserved exactly as generated because the accuracy limitations of the Teams transcript are part of the evidence. Bracketed notes identify uncertainty or incomplete text without supplying inferred corrections.

Speaker labels:
"Kassie Slater" is identified by Microsoft Teams.
Microsoft Teams labels both household participants collectively as "David and Maddy (Unverified)." Those utterances are therefore identified below as "Shared device" unless a declarant's personal knowledge establishes the speaker.

Scope:
The SHRA representative appears at approximately 4:40. The earlier portion is pre-meeting material and is omitted. The substantive meeting concludes at approximately 9:30.

---

MICROSOFT TEAMS-GENERATED TRANSCRIPT

---

[Approx. 4:44]

KASSIE SLATER:
Morning.

SHARED DEVICE:
Hi.

KASSIE SLATER:
Hey there.

KASSIE SLATER:
Are you Sidney?

SHARED DEVICE:
Yes. I am.

KASSIE SLATER:
Hi. Nice to meet you. My name is Cassie Slater. I'm the assistant director here at the Sacramento Housing and Redevelopment Agency.

KASSIE SLATER:
Is everybody here that's going to be joining us just you and I today?

SHARED DEVICE:
Can I see the?

KASSIE SLATER:
Is it just you and I, Miss Roberts? Oh, hello. Now I can see everybody.

KASSIE SLATER:
And I'm assuming David, Daniel, Mr. Samuel.

SHARED DEVICE:
Yes.

KASSIE SLATER:
Hi, I'm Cassie Slater. I don't know if you were here when we did introductions, but I'm the assistant director here at the Sacramento Housing and Redevelopment Agency. Thanks for meeting with us or with me this morning.

[Approx. 5:40]

KASSIE SLATER:
So this meeting has just been scheduled just for us to have a chat regarding the request for a switch in the head of household and again, the purpose of this meeting.

KASSIE SLATER:
Is just to ensure.

KASSIE SLATER:
That this request is coming from the current head of Household, who we have labeled as Miss Sidney Roberts and just confirming with you, Miss Roberts, that you are aware of this request and that you would like to make this swap and then just going over what that that.

KASSIE SLATER:
Means when you do make those change, if that's what you decide to do.

SHARED DEVICE:
OK.

[Approx. 6:12-6:24]

KASSIE SLATER:
OK, so as they had a household, right, you're responsible for reporting income changes?

[Preserved as generated by Teams; no correction made.]

KASSIE SLATER:
I'm going through the annual recertification process, the voucher in a sense is under your name and for lack of better words belongs to you.

[Approx. 6:24-6:48]

KASSIE SLATER:
If there was a separation of the family, we would look to see who the voucher would go to if there was some type of.

KASSIE SLATER:
A separation and if the person typically who we would side with to get, excuse me.

[Teams text incomplete/garbled.]

SHARED DEVICE:
Oh, I I figured that this was the the push you guys were going to.

SHARED DEVICE:
Try to encourage.

SHARED DEVICE:
Yeah, that's actually something we would contest, even if there was a separation.

SHARED DEVICE:
The voucher is able to be split between both parents, so it would.

[Approx. 6:56-7:16]

KASSIE SLATER:
Yeah, we don't bifurcate the voucher so, so. So if I may finish.

KASSIE SLATER:
And so we just really wanted you to understand what that would mean as far as giving up the voucher.

KASSIE SLATER:
But we would typically side with whoever children if they're. If your children in their home, which in your case I see that there if you have two.

[Teams syntax is incomplete/garbled; quoted words above are preserved as generated.]

[Approx. 7:20-7:32]

KASSIE SLATER:
So if there was a separation of the family, we just want to ensure that you know what that meant. If you were to relinquish.

KASSIE SLATER:
The voucher.

[Two subsequent Slater fragments are unintelligible/garbled.]

SHARED DEVICE:
Relinquish the voucher.

SHARED DEVICE:
I need to add that the complaint.

KASSIE SLATER:
I'm having a hard time.

[Approx. 7:36-7:52]

SHARED DEVICE:
Yeah. No, no, the, the, relinquish the voucher is actually.

KASSIE SLATER:
Things to give up.

KASSIE SLATER:
It means to give up.

KASSIE SLATER:
It means to give up.

KASSIE SLATER:
So she was to give up her.

SHARED DEVICE:
Does she think I didn't know what relinquish means?

[Approx. 7:52-8:12]

KASSIE SLATER:
Well, I'm I'm I. You're explaining something to me and I'm letting you know.

KASSIE SLATER:
So I'm not gonna get into what Kaiser.

[Teams word unclear; no correction made.]

KASSIE SLATER:
OK.

KASSIE SLATER:
Well, however, we're, I'm not a lawyer.

KASSIE SLATER:
I don't think you are either.

KASSIE SLATER:
So my point of this meeting is to Miss Roberts.

[Approx. 8:12-8:28]

KASSIE SLATER:
Would you like to switch the head of household to Mr. Samuel?

SHARED DEVICE:
OK.

KASSIE SLATER:
It's a yes or no. Would you like to give up? OK.

SHARED DEVICE:
Would you like to give up?

KASSIE SLATER:
Yes, that's that is what that is.

[Approx. 8:28-8:44]

KASSIE SLATER:
So when she came in as a referral, she was they had a household.

[Preserved as generated by Teams; no correction made.]

KASSIE SLATER:
So we have to let she has to give up her space in the home to somebody else, OK?

KASSIE SLATER:
Thank you.

SHARED DEVICE:
You can continue using the language we have it what we need.

[Preserved as generated by Teams; no correction made.]

KASSIE SLATER:
Thank you for allowing me to ask her the question.

[Approx. 8:44-9:00]

KASSIE SLATER:
Alrighty. So in a sense, we're gonna go ahead and we'll make that swap.

KASSIE SLATER:
And then, Mr. Samuel.

SHARED DEVICE:
What? What does innocence mean?

[Preserved as generated by Teams; no correction made.]

KASSIE SLATER:
We're going to make that swap.

SHARED DEVICE:
We're going to make that stop, OK?

[Preserved as generated by Teams; no correction made.]

[Approx. 9:00-9:20]

KASSIE SLATER:
Walk and then Mr Samuel you'll need to make sure that you're reporting all of the changes as far as income as far as assets. Just make sure that you are responsible for reporting things timely to the Housing Authority.

[Preserved as generated by Teams; no correction made.]

KASSIE SLATER:
We can send you a copy of the family OB.

[Teams renders "OB."; no expansion or correction made.]

KASSIE SLATER:
So that way you can resign to make sure that you understand what it means to be the head household.

[Preserved as generated by Teams; no correction made.]

SHARED DEVICE:
So is this are we done?

[Approx. 9:20-9:30]

KASSIE SLATER:
Yeah, that's it.

KASSIE SLATER:
I just needed to make sure to confirm with Miss Roberts that this is what she would like to do.

SHARED DEVICE:
All right.

SHARED DEVICE:
Thank you for your time.

KASSIE SLATER:
Thank you.

----------------------------------------------------------------
END OF MICROSOFT TEAMS-GENERATED TRANSCRIPT
----------------------------------------------------------------

David Samuel, Pro Se
Sydney Roberts, Pro Se
Plaintiffs
108 Rinetti Way
Rio Linda, CA 95673
512-522-8571
edfed@possiblymaybe.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYDNEY ROBERTS,<br>DAVID SAMUEL,<br><br>Plaintiffs,<br><br>v.<br><br>SACRAMENTO HOUSING AND REDEVELOPMENT AGENCY, ET AL.,,<br><br>Defendants | Case No: 2:22-cv-01699 DJC AC<br><br>**SUPPLEMENTAL DECLARATION OF SYDNEY BROOKE ROBERTS REGARDING ECF NO. 179** |

1) I, Sydney Brooke Roberts, declare:

2) I am a Plaintiff in this action and proceed without counsel. I have personal knowledge of the facts stated here and, if called, could testify competently to them.

3) David Tyrone Samuel and I are adult members of the same household and participate with our children in SHRA's Housing Choice Voucher program. SHRA's historical records identify me as head of household. Mr. Samuel and I remain members of the same intact assisted family and household.

4) On March 17, 2026, Mr. Samuel and I completed our annual recertification through SHRA's Resident Portal. The submission designated Mr. Samuel as head of household. I participated in the submission, knowingly and voluntarily approved that designation, and digitally signed the submitted forms. No one pressured or coerced me.

The portal accepted our completed submission.

5) On April 24, 2026, SHRA reopened the March submission because the head-of-household designation did not match the original application. SHRA directed both of us to sign and submit the forms again with me designated as head of household and Mr. Samuel designated as spouse or partner. I did not agree that the historical designation should replace the current designation we had submitted.

6) I read, approved, and joined our April 24 written response. We confirmed that the household designated Mr. Samuel as head of household and asked SHRA to identify any form, step, regulation, Administrative Plan provision, HUD instruction, or other written authority that required a different designation. I continued to authorize the requested change.

7) On June 25, SHRA sent an appointment notice directing me to attend an in-person meeting on July 2. The notice described the subject only as a request received April 24. It did not explain why a meeting was necessary, identify any defect in our March submission, identify any policy requiring a meeting, or tell me what consequences or subjects SHRA intended to discuss.

8) I read, approved, and joined our June 25 response. We requested a remote meeting, communication by email, advance written identification of the issues and asserted authority, and an accurate meeting record or equivalent. I expressly authorized Mr. Samuel to communicate with SHRA, receive voucher-related correspondence, submit requests and responses, participate in meetings, request accommodations, and represent our household concerning the recertification and head-of-household

designation.

9) On July 9, SHRA stated in writing that the meeting's purpose was limited to verifying directly with me that the requested change was voluntary and that I understood its effect. SHRA did not identify a regulation, Administrative Plan provision, or written policy requiring a meeting. SHRA stated that the requested change would be cancelled if it could not verify my wishes or obtain information it considered necessary.

10) SHRA also sent a reasonable-accommodation form prefilled with me as head of household and asked whether I needed an accommodation to participate in an in-person meeting. Mr. Samuel, not I, is the household member whose disability was the basis of the communication and meeting requests. I had already joined those requests and authorized him to communicate and participate for our household.

11) I read, approved, and joined our July 9 response. I again confirmed the requested head-of-household designation and offered to participate personally in a remote meeting and confirm the designation directly and in my own words. We again asked SHRA to identify the authority requiring any meeting and requested the issues in writing in advance. SHRA acknowledged receipt but did not identify any such authority.

12) On July 23, SHRA offered an in-person or virtual meeting. On July 24, I read, approved, and joined our response selecting the virtual option under protest. We confirmed that both Mr. Samuel and I would participate and that our participation did not concede that a meeting was required by HUD regulation, SHRA policy, or the Administrative Plan. We again requested the specific issues and asserted authority in writing before the meeting. SHRA did not provide them.

13) On August 7, 2026, I signed my declaration supporting ECF No. 179. In that declaration I stated under penalty of perjury that I had knowingly and voluntarily approved the submission identifying Mr. Samuel as head of household, that no one had pressured or coerced me, that I continued to authorize the change, and that I remained willing to confirm it directly to SHRA.

14) Before the August 26 meeting, SHRA therefore already had my digital signature on the March submission, my joined April 24, June 25, July 9, and July 24 responses, my express written authorization for Mr. Samuel to communicate and participate, and my August 7 declaration under penalty of perjury. The meeting did not obtain a confirmation of my wishes that I had not already given SHRA repeatedly in writing.

15) On August 26, 2026, beginning at approximately 10:00 a.m., Mr. Samuel and I attended the meeting together by Microsoft Teams on a single device. Microsoft Teams labeled our device "David and Maddy (Unverified)," which did not distinguish between our individual statements. Exhibit A, the Microsoft Teams-generated transcript, therefore uses the label "Shared device" unless a declarant's personal knowledge establishes the speaker.

16) Kassie Slater was the only SHRA representative present. She identified herself as an SHRA Assistant Director. At the outset, she stated that the purpose of the meeting was to ensure that the head-of-household request came from me, to confirm that I wanted to make the change, and to explain what the change meant. I said the first "OK" reflected in the Teams transcript to acknowledge that explanation.

17) I understood before the meeting that SHRA wanted me to confirm my voluntary

request to change the designated head of household from me to Mr. Samuel. Nothing SHRA provided before the meeting told me that SHRA would treat that request as my relinquishment of the voucher, a separation of our family, my withdrawal from the assisted household, or my agreement to give up my place in our home.

18) After stating the meeting's purpose, Ms. Slater addressed me as the person SHRA still identified as head of household. She told me I was responsible for reporting income changes and the annual-recertification process. She then stated that "the voucher in a sense is under your name and for lack of better words belongs to you."

19) Ms. Slater next introduced a hypothetical separation of our family. She said that, if the family separated, SHRA would determine who the voucher would go to. We had not requested a separation, removal of a family member, or division of the household. Mr. Samuel and I remained, and remain, members of the same household with our children.

20) Ms. Slater then stated that SHRA wanted me to understand what the requested change would mean "as far as giving up the voucher." She continued by stating that SHRA wanted to ensure I understood what it meant if I were "to relinquish" the voucher. When Mr. Samuel objected to that characterization, Ms. Slater stated twice that relinquish meant "to give up."

21) Ms. Slater then asked me, "Would you like to switch the head of household to Mr. Samuel?" I said, "OK." In that context, my answer meant that I wanted SHRA to make the designation change I had already approved and confirmed repeatedly in writing. It did not mean that I wanted to give up the voucher or leave the household.

22) Ms. Slater immediately reframed the question as, "It's a yes or no. Would you like to give up? OK." I repeated her new question back to her: "Would you like to give up?" I repeated it because I understood those words literally as asking whether I wanted to give up the voucher. I did not want to give up the voucher. Ms. Slater answered, "Yes, that's that is what that is."

23) Ms. Slater then stated that I "has to give up her space in the home to somebody else, OK?" I did not agree with that statement. I did not agree to give up my space in our home, leave our household, withdraw from our assisted family, or relinquish or surrender the voucher.

24) I understood Ms. Slater's statements as one continuous explanation of what SHRA claimed my requested change meant. She first framed the voucher as belonging to me individually, then introduced separation of our family and who would receive the voucher, then described the designation change as giving up or relinquishing the voucher, then replaced the question whether I wanted to change the designation with the question whether I wanted to "give up," and finally stated that I had to give up my space in the home. That was not the change I had requested or approved.

25) Near the end of the meeting, Ms. Slater stated that SHRA would "go ahead and we'll make that swap" and then, "We're going to make that swap." She gave Mr. Samuel instructions about reporting income and assets. She ended the meeting by stating that she had needed to confirm with me that this was what I wanted to do.

26) What I wanted, and what I had approved since March 17, was only to change the household member designated as head of household from me to Mr. Samuel. I did not

ask SHRA to alter the composition of our family, remove me from the voucher or household, terminate any assistance, or decide who would receive assistance if our family separated.

27) Before or during the meeting, SHRA did not identify any regulation, Administrative Plan provision, or written SHRA policy requiring the meeting. Before the meeting, SHRA did not tell me that it would discuss a hypothetical separation of our family, ownership of the voucher, relinquishment or surrender of assistance, bifurcation, or whether I would give up my place in our home. Those subjects did not match the limited purpose SHRA had stated in writing.

28) I have not relinquished, surrendered, or withdrawn from the voucher, the assisted family, or the household. I do not intend to do so. I have not signed any document describing the requested head-of-household change as my relinquishment, surrender, withdrawal, or removal.

29) At the meeting, SHRA did not give me a written determination concerning the requested head-of-household change or the remaining accommodation and communication requests, including the request for an accurate meeting record or equivalent.

30) I provide this declaration to report the complete sequence and what I personally did, heard, understood, and said. Exhibit A separately preserves the Microsoft Teams-generated transcript, including its apparent transcription errors.

31) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 1, 2026, at Rio Linda,

California.

Sydney Roberts

Sydney Roberts September 1, 2026

# EXHIBIT A

EXHIBIT – COURT-DRAFT COPY
MICROSOFT TEAMS-GENERATED TRANSCRIPT OF SHRA MEETING
August 26, 2026

Source:
Microsoft Teams transcript generated during the August 26, 2026 meeting.

Transcript method:
Microsoft Teams generated the transcript text during the meeting. The Microsoft Teams wording, including apparent transcription errors, is intentionally preserved exactly as generated because the accuracy limitations of the Teams transcript are part of the evidence. Bracketed notes identify uncertainty or incomplete text without supplying inferred corrections.

Speaker labels:
"Kassie Slater" is identified by Microsoft Teams.
Microsoft Teams labels both household participants collectively as "David and Maddy (Unverified)." Those utterances are therefore identified below as "Shared device" unless a declarant's personal knowledge establishes the speaker.

Scope:
The SHRA representative appears at approximately 4:40. The earlier portion is pre-meeting material and is omitted. The substantive meeting concludes at approximately 9:30.

---

MICROSOFT TEAMS-GENERATED TRANSCRIPT

---

[Approx. 4:44]

KASSIE SLATER:
Morning.

SHARED DEVICE:
Hi.

KASSIE SLATER:
Hey there.

KASSIE SLATER:
Are you Sidney?

SHARED DEVICE:
Yes. I am.

KASSIE SLATER:
Hi. Nice to meet you. My name is Cassie Slater. I'm the assistant director here at the Sacramento Housing and Redevelopment Agency.

KASSIE SLATER:
Is everybody here that's going to be joining us just you and I today?

SHARED DEVICE:
Can I see the?

KASSIE SLATER:
Is it just you and I, Miss Roberts? Oh, hello. Now I can see everybody.

KASSIE SLATER:
And I'm assuming David, Daniel, Mr. Samuel.

SHARED DEVICE:
Yes.

KASSIE SLATER:
Hi, I'm Cassie Slater. I don't know if you were here when we did introductions, but I'm the assistant director here at the Sacramento Housing and Redevelopment Agency. Thanks for meeting with us or with me this morning.

[Approx. 5:40]

KASSIE SLATER:
So this meeting has just been scheduled just for us to have a chat regarding the request for a switch in the head of household and again, the purpose of this meeting.

KASSIE SLATER:
Is just to ensure.

KASSIE SLATER:
That this request is coming from the current head of Household, who we have labeled as Miss Sidney Roberts and just confirming with you, Miss Roberts, that you are aware of this request and that you would like to make this swap and then just going over what that that.

KASSIE SLATER:
Means when you do make those change, if that's what you decide to do.

SHARED DEVICE:
OK.

[Approx. 6:12-6:24]

KASSIE SLATER:
OK, so as they had a household, right, you're responsible for reporting income changes?

[Preserved as generated by Teams; no correction made.]

KASSIE SLATER:
I'm going through the annual recertification process, the voucher in a sense is under your name and for lack of better words belongs to you.

[Approx. 6:24-6:48]

KASSIE SLATER:
If there was a separation of the family, we would look to see who the voucher would go to if there was some type of.

KASSIE SLATER:
A separation and if the person typically who we would side with to get, excuse me.

[Teams text incomplete/garbled.]

SHARED DEVICE:
Oh, I I figured that this was the the push you guys were going to.

SHARED DEVICE:
Try to encourage.

SHARED DEVICE:
Yeah, that's actually something we would contest, even if there was a separation.

SHARED DEVICE:
The voucher is able to be split between both parents, so it would.

[Approx. 6:56-7:16]

KASSIE SLATER:
Yeah, we don't bifurcate the voucher so, so. So if I may finish.

KASSIE SLATER:
And so we just really wanted you to understand what that would mean as far as giving up the voucher.

KASSIE SLATER:
But we would typically side with whoever children if they're. If your children in their home, which in your case I see that there if you have two.

[Teams syntax is incomplete/garbled; quoted words above are preserved as generated.]

[Approx. 7:20-7:32]

KASSIE SLATER:
So if there was a separation of the family, we just want to ensure that you know what that meant. If you were to relinquish.

KASSIE SLATER:
The voucher.

[Two subsequent Slater fragments are unintelligible/garbled.]

SHARED DEVICE:
Relinquish the voucher.

SHARED DEVICE:
I need to add that the complaint.

KASSIE SLATER:
I'm having a hard time.

[Approx. 7:36-7:52]

SHARED DEVICE:
Yeah. No, no, the, the, relinquish the voucher is actually.

KASSIE SLATER:
Things to give up.

KASSIE SLATER:
It means to give up.

KASSIE SLATER:
It means to give up.

KASSIE SLATER:
So she was to give up her.

SHARED DEVICE:
Does she think I didn't know what relinquish means?

[Approx. 7:52-8:12]

KASSIE SLATER:
Well, I'm I'm I. You're explaining something to me and I'm letting you know.

KASSIE SLATER:
So I'm not gonna get into what Kaiser.

[Teams word unclear; no correction made.]

KASSIE SLATER:
OK.

KASSIE SLATER:
Well, however, we're, I'm not a lawyer.

KASSIE SLATER:
I don't think you are either.

KASSIE SLATER:
So my point of this meeting is to Miss Roberts.

[Approx. 8:12-8:28]

KASSIE SLATER:
Would you like to switch the head of household to Mr. Samuel?

SHARED DEVICE:
OK.

KASSIE SLATER:
It's a yes or no. Would you like to give up? OK.

SHARED DEVICE:
Would you like to give up?

KASSIE SLATER:
Yes, that's that is what that is.

[Approx. 8:28-8:44]

KASSIE SLATER:
So when she came in as a referral, she was they had a household.

[Preserved as generated by Teams; no correction made.]

KASSIE SLATER:
So we have to let she has to give up her space in the home to somebody else, OK?

KASSIE SLATER:
Thank you.

SHARED DEVICE:
You can continue using the language we have it what we need.

[Preserved as generated by Teams; no correction made.]

KASSIE SLATER:
Thank you for allowing me to ask her the question.

[Approx. 8:44-9:00]

KASSIE SLATER:
Alrighty. So in a sense, we're gonna go ahead and we'll make that swap.

KASSIE SLATER:
And then, Mr. Samuel.

SHARED DEVICE:
What? What does innocence mean?

[Preserved as generated by Teams; no correction made.]

KASSIE SLATER:
We're going to make that swap.

SHARED DEVICE:
We're going to make that stop, OK?

[Preserved as generated by Teams; no correction made.]

[Approx. 9:00-9:20]

KASSIE SLATER:
Walk and then Mr Samuel you'll need to make sure that you're reporting all of the changes as far as income as far as assets. Just make sure that you are responsible for reporting things timely to the Housing Authority.

[Preserved as generated by Teams; no correction made.]

KASSIE SLATER:
We can send you a copy of the family OB.

[Teams renders "OB."; no expansion or correction made.]

KASSIE SLATER:
So that way you can resign to make sure that you understand what it means to be the head household.

[Preserved as generated by Teams; no correction made.]

SHARED DEVICE:
So is this are we done?

[Approx. 9:20-9:30]

KASSIE SLATER:
Yeah, that's it.

KASSIE SLATER:
I just needed to make sure to confirm with Miss Roberts that this is what she would like to do.

SHARED DEVICE:
All right.

SHARED DEVICE:
Thank you for your time.

KASSIE SLATER:
Thank you.

-----------------------------------------------------------------
END OF MICROSOFT TEAMS-GENERATED TRANSCRIPT
-----------------------------------------------------------------

David Samuel, Pro Se
Sydney Roberts, Pro Se
Plaintiffs
108 Rinetti Way
Rio Linda, CA 95673
512-522-8571
edfed@possiblymaybe.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYDNEY ROBERTS,<br>DAVID SAMUEL,<br><br>Plaintiffs,<br><br>v.<br><br>SACRAMENTO HOUSING AND REDEVELOPMENT AGENCY, ET AL.,,<br><br>Defendants | Case No: 2:22-cv-01699 DJC AC<br><br>**PROPOSED NOTICE OF POST-FILING EVENT REGARDING ECF NO. 179** |

1) Subject to the Court's approval under Local Rule 230(m), Plaintiffs give limited notice that SHRA conducted the head-of-household meeting described in ECF No. 179 on August 26, 2026. Before the meeting, SHRA already possessed the March recertification signed by both adult household members with David Tyrone Samuel designated as head of household, four joined written responses from both Plaintiffs, Sydney Brooke Roberts's express written authorization, and her August 7 declaration under penalty of perjury confirming that the requested change was knowing and voluntary.

2) SHRA had stated that the meeting's purpose was to verify Ms. Roberts's voluntary request and understanding. At the meeting, SHRA Assistant Director Kassie Slater instead progressed from stating that the voucher was under Ms. Roberts's name

and belonged to her, to a hypothetical family separation, to describing the designation change as giving up or relinquishing the voucher, to restating the question whether Ms. Roberts wanted to change the designation as whether she wanted to "give up," and to stating that Ms. Roberts had to give up her space in the home. Ms. Slater then stated that SHRA would make the requested "swap."

3) The Supplemental Declarations of David Tyrone Samuel and Sydney Brooke Roberts and Exhibit A, the Microsoft Teams-generated transcript, report that completed post-filing event and update the status of the continuing sequence presented in ECF No. 179. They do not add a claim, party, or supplemental merits memorandum. Plaintiffs ask the Court to consider the event only to the extent relevant to ECF No. 179 and to give the material the weight the Court deems appropriate.

David Samuel

David Samuel September 1, 2026

Sydney Roberts

Sydney Roberts September 1, 2026

David Tyrone Samuel, Pro Se
Sydney Brooke Roberts, Pro Se
Plaintiffs
108 Rinetti Way
Rio Linda, California 95673
Telephone: 512-522-8571
Email: edfed@possiblymaybe.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SYDNEY BROOKE ROBERTS and DAVID TYRONE SAMUEL,<br><br>Plaintiffs,<br><br>v.<br><br>SACRAMENTO HOUSING AND REDEVELOPMENT AGENCY, et al.,<br>Defendants. | Case No. 2:22-cv-01699-DJC-AC<br><br>**PROOF OF SERVICE** |

I, David Tyrone Samuel, declare that I am over the age of eighteen and am a Plaintiff proceeding without counsel in this action. My address is 108 Rinetti Way, Rio Linda, California 95673.

On September 1, 2026, I served true and correct copies of the following documents by electronic mail:

- Plaintiffs' Motion for Administrative Relief Under Local Rule 233 and Request for Prior Approval Under Local Rule 230(m) to Submit Evidence of a Post-Filing Event Regarding ECF No. 179;
- Proposed Notice of Post-Filing Event Regarding ECF No. 179;
- Supplemental Declaration of David Tyrone Samuel Regarding ECF No. 179; and
- Supplemental Declaration of Sydney Brooke Roberts Regarding ECF No. 179, with Exhibit A (Microsoft Teams Transcript dated August 26, 2026) attached to the declarations.

The documents were emailed to Defendants' counsel of record:

Edward P. Garson - Edward.Garson@wilsonelser.com
Monica Castillo - Monica.Castillo@wilsonelser.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 1, 2026, at Rio Linda, California.

David Samuel

David Tyrone Samuel September 1, 2026